# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00678-CV

**Maximo Munoz Aguilar, Appellant**

**v.**

**Kimberly Lee Foy and Thompson Ray Foy, Jr., Appellees**

## FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 425TH JUDICIAL DISTRICT
## NO. 07-043-A425, HONORABLE MARK J. SILVERSTONE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

After a bench trial, the trial court terminated Maximo Munoz Aguilar's parental rights to two children and established Kimberly Lee Foy and Thompson Ray Foy, Jr., as the children's adoptive parents. On appeal, Aguilar contends that the trial court erred by admitting an expert opinion on the children's best interests, arguing that the expert's failure to investigate him or his home fatally undermined the expert's opinion. Aguilar also contends that the evidence was legally and factually insufficient to support the findings that he placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, that he engaged in conduct or knowingly placed the minor children with persons who engaged in conduct that endangered the children's physical or emotional well-being, and that termination was in the children's best interest. We will affirm the judgment.

## BACKGROUND

Maximo Aguilar and Angela Meissner had three children together, the older two of whom are the subject of this case. The children were born in September 2003 and October 2004. A third child, born in July 2006, is not the subject of this case.

Aguilar and Meissner have somewhat checkered legal records. Aguilar admitted to a variety of arrests beginning in 1997 when he was sixteen years old and continuing through his 2006 arrest for possession of cocaine with intent to deliver.[1] Meissner was arrested for driving while intoxicated in 1999, forgery in 2001 (as a party), and forgery in 2006.

The attorney general filed suit in Bosque County in July 2005, seeking child support from Aguilar after he and Meissner separated. The children were living with Meissner. Aguilar and Meissner later had a third child, although they separated months before that child was born.

When Meissner and their newborn third child tested positive for cocaine in July 2006, the Department of Family and Protective Services intervened. The Department let Meissner designate where her children were placed, subject to review. Aguilar could not take the children because he was incarcerated. The newborn went to live with Meissner's mother, and the two older children went to live with the Foys on July 7, 2006. Kim Foy is Meissner's cousin. The older children have lived with the Foys since. The Department formalized the placement with the Foys in a Plan for Immediate and Short-Term Child Safety dated July 27, 2006, which was intended to last three months.

---

[1] Other arrests included minor in possession, assault, criminal trespass, organized criminal activity, and fleeing police in 1999, failure to identify and aggravated assault in 2004, and assault with family violence (against Meissner) in 2005.

Meissner did not finish the classes or make the changes that the Department deemed necessary for her children's safety. In a letter from the Department to Meissner dated March 7, 2007, the Department stated that it was closing the case with the expectation that the children would remain in their respective placements. The Department stated that the Foys and Meissner's mother agreed "to follow through with pursuing legal custody of the children." The letter did not mention Aguilar.

Meanwhile, Aguilar had been released from incarceration in August 2006. Aguilar testified without contradiction that he completed the parenting and anger-management classes prescribed by the Department. He testified that when he learned the case had been closed, he called the Department to determine what that meant with respect to him. He testified that Department employees told him he could go and pick up his children. Aguilar called and told the Foys that he was coming to take the children.

Kim Foy testified that she did not know that Aguilar had or believed he had the legal right to the children. When Aguilar arrived, the Foys called the police and Aguilar left without the children. The Foys filed this suit on May 14, 2007 seeking to terminate his parental rights and to adopt the children themselves. They obtained a temporary restraining order preventing Aguilar from contacting the children. The restraining order was set to expire on June 12, 2007, but was extended by agreement "until the next scheduled hearing date set for June 25, 2007 at 9:00 a.m." Aguilar agreed to abide by the restraints of the order "until further order of the Court at that time." There is no indication in the record that any further order was issued through the termination of parental rights.

Although Aguilar had paid child support previously pursuant to the Bosque County order,[2] he stopped paying support shortly after the Foys filed this termination suit in Williamson County. On August 28, 2008, the Bosque County court transferred jurisdiction over the suit pending there involving the older children to Williamson County while retaining jurisdiction over the suit involving the youngest child.

The Williamson County district court held its first hearing concerning the termination of Aguilar's parental rights in February 2009. The court heard testimony from Aguilar, the children's treating psychologist, and a counselor who conducted a home study on the Foys. On June 19, 2009, Meissner filed an Affidavit of Voluntary Relinquishment of Parental Rights concerning the two children at issue in this case shortly before she was incarcerated in July 2009 for committing theft by check. Meissner gave her deposition in late July 2009. When the hearing on termination resumed and concluded in May 2010, the court admitted that deposition and heard testimony from Kim Foy and Aguilar.

In her deposition, Meissner described her use of alcohol and drugs. She testified that, in the period between 2001 and 2006, she drank as much beer as she could and used marijuana daily, cocaine twice a week, and methamphetamine twice a month. She testified that Aguilar provided her with cocaine and marijuana and did not mind her doing drugs as long as she did not do them around the children. She testified that she would get high and leave home and Aguilar would confront her when she returned because he wanted her to stay and make a home. She usually left the children in

---

[2] A September 2006 order from the Bosque County court showed that in 2005-06 he had paid $4,175.18 and owed $145.16 in child support, and that he had paid $250 in medical support and owed another $50.

4

the care of Aguilar's relatives, but once took one of the children with her during a week-long drug foray. She testified that when she returned from that trip, Aguilar confronted her angrily and kicked her while she was on the floor as one of their children watched. She testified that Aguilar did not provide her drugs during her third pregnancy, although she believed that he knew second-hand that she was using drugs while pregnant. She testified that she relinquished her parental rights because the children are safe and happy with the Foys, which is what she wants.

Meissner also testified regarding Aguilar's use of alcohol and drugs and his parenting abilities. She testified that she first met Aguilar at a party where they did a line of cocaine together. She testified that he had used illegal drugs recreationally on the weekends, but did not know whether he was currently using drugs. She testified that Aguilar was a good father when he was not drunk, and that he only drank when others were watching their children. Although she worried about the possibility that he might be violent to others in front of the children, she did not fear that he would harm the children. Meissner described Aguilar as a good parent who loved his kids and could take care of them. Meissner also testified that her mother reports that Aguilar is good with their third child during his visits. Meissner said her only concern about Aguilar having custody was that the older children have not seen him in three years and do not know him. Assuming that there was no risk of violence and that custody gradually transitioned, she had no problem with Aguilar getting custody except for her fear that Aguilar would not allow the Foys or her to see the children again.

Aguilar's testimony contradicted some of the characterization of his past and emphasized the stability of his present. He denied supplying Meissner with drugs or knowing that she used any illegal drug other than marijuana, pointing out that he was in jail when she tested

5

positive for cocaine at their third child's birth. He also denied hitting Meissner, asserting that the case charging that he hit her was dismissed. He read aloud a portion of the Department caseworker's July 2006 report stating that both parents' legal issues put the children at risk of being unsupervised while the parents "interact[ed] with illegal activities." He denied telling a Department caseworker that cocaine was his "drug of choice," but admitted that he was convicted for possession of cocaine on what he claimed was his first time to possess cocaine. He testified that he has neither drunk alcohol nor used illegal drugs while on probation since 2006. He said that he completed the anger-management and parenting classes prescribed by the Department. Aguilar denied threatening the Foys when he went to get the children in 2007, and testified that he had nothing bad to say about them because he did not know them. He is in good standing on probation and has had only clean urinalyses while on probation. He testified that he sees their third child every other weekend, has no restrictions on the nature of his visits, and is current on his child-support obligations for that child. Aguilar testified that he had held the same job for four years and lived in the same house for three years. His wife is a medical aide who is studying to be a nurse, and they have a son together in addition to her two daughters.

Martha Pinto, a counselor, testified about the results of her home study examining the propriety of the placement with the Foys in July, August, and November 2007. She met with and observed the Foys and the children. Pinto had direct, age-appropriate interaction with the children, who were then three and four years old. She also talked on the telephone with Kim Foy. Pinto described the Foys' home as "very comfortable, loving, respectful, a wonderful place for children to be raised." She testified that the Foys have a wonderful bond with the children, that they

6

have open communication and a good mix of nurture and structure, and that the children think of the Foys as their parents. Pinto did not meet with the birth parents. Pinto did not inquire into Aguilar's suitability as a parent because she believed that inquiry was outside the scope of her responsibility in this case. The trial court declined to consider paragraphs in her report concerning Aguilar, finding that underlying information was not admissible. She testified that adoption by the Foys was in the children's best interests.

Dr. Joseph Achacoso, the children's treating psychologist, also testified that adoption by the Foys would be in the children's best interests. He testified that, when he first saw the children in January 2007, they acted out, had a lot of anxiety, and exhibited aggressive behavior. The older child seemed agitated, and his play was unfocused and aggressive, while the younger child had attachment issues and was "clingy." Achacoso testified that these behaviors were more pronounced after visits with Aguilar and Meissner. Achacoso testified that the Foys love and set good structure for the children. He opined that returning the children to Aguilar would be detrimental to the children and allowing him to have visitation rights could negatively affect them. Achacoso never met Aguilar, and conceded that he would be better equipped to render an opinion about adoption if he had interviewed Aguilar. He agreed that the children still exhibited troubling behaviors—for instance, the older child's hostility—but that they had improved during two years of therapy and under the Foys' care.

Kim Foy testified that Aguilar visited the children three times during the first year they were in her custody and spoke with them on the phone a few times. She said the older child last saw Aguilar on April 28, 2007, and the younger child last saw Aguilar on May 12, 2007. Foy

7

said that she had no notice from the Department that Aguilar had the right to take the children in May 2007. The children last received child support payments from Aguilar in August 2007. She testified that Aguilar had sent some Christmas presents through their grandmother and had sent birthday presents, but not every year. She testified that the children were doing well in school and had no physical or mental problems. She testified that, because the children had been with her and her husband for almost four years when she testified in May 2010, letting Aguilar have any relationship or visitation with them would disrupt their lives because they did not know him. Foy testified that she considered the children to be her sons and that removing the children from their home since July 2006 would not be in their best interests.

The Williamson County district court signed the decree terminating Aguilar's parental rights on September 15, 2010. Aguilar appealed and filed his brief on April 27, 2011. The Foys filed their brief on October 19, 2011.

## DISCUSSION

Aguilar raises seven issues on appeal. He challenges the trial court's admission of an expert opinion. He also challenges the legal and factual sufficiency of the evidence to support the trial court's findings of acts and omissions constituting two grounds for termination of his parental rights and its finding that termination of his parental rights is in the children's best interests.

**Admission of evidence**

Aguilar contends that the trial court erred by admitting the opinion of Achacoso, the children's treating psychologist, that the children's best interests would be served if they were

8

adopted by the Foys. Aguilar argues that Achacoso's failure to interview Aguilar or to talk to anyone about him fatally undermined the foundation of Achacoso's opinion regarding the best interests of the children. *See generally* Tex. R. Evid. 702-05.

We review a trial court's decision that a witness is qualified as an expert for an abuse of discretion. *See Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 649 (Tex. App.—Austin 2005, pet. denied) (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 728 (Tex. 1998)). A trial court abuses its discretion when it rules on the admissibility of evidence in an arbitrary or unreasonable manner or without reference to guiding legal principles or rules. *Id.* at 649-50 (citing *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex. 2002)). We must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to support it. *Id.* at 650 (citing *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998)).

The admissibility of an opinion regarding the children's best interest is subject to wider discretion than opinions based on "hard" science. *See id.* Texas Rule of Evidence 702 provides that a witness who qualifies as an expert because of knowledge, skill, experience, training, or education may testify as an expert if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or resolve an issue of fact. *Id.* The basis of opinions regarding the children's best interest will vary from case to case because the relevant facts vary among cases. *Id.* (citing *Chacon v. Chacon*, 978 S.W.2d 633, 637-38 (Tex. App.—El Paso 1998, no pet.)). The *Chacon* court, reviewing a custody decision after a divorce, opined that a

9

social study is designed to be comparative in nature regarding the parenting abilities of litigants. 978 S.W.2d at 638.

Achacoso plainly stated that his opinion that the children should remain with the Foys was premised "[p]rimarily on the factor of having a stable environment for the children." He had treated the children for two years, beginning shortly after their last visit with their birth parents and continuing weekly up to at least when Achacoso testified. He described the children's initial agitation, aggression, and attachment issues and how those issues had eased or evolved while they lived with the Foys. He also met with the Foys regarding issues the children faced and observed the Foys interacting with the children. He opined that the children have improved and have stability with the Foys. Achacoso's opinion regarding the propriety of returning the children to Aguilar or allowing him visitation undisputedly and admittedly is not based on any investigation of Aguilar as a parent. Achacoso admitted that his only source for family history is Kim Foy. Achacoso conceded that he would be better equipped to render an opinion about adoption if he had personally interviewed the birth mother and birth father.

We conclude that the trial court did not abuse its discretion by admitting Achacoso's opinion. We cannot say that Achacoso's analysis was unreliable and inadmissible because he did not interview the birth parents. He determined that the primary factor in promoting these children's best interests was stability in their environment and described why. His opinion that termination of Aguilar's parental rights served the children's best interest is consistent with his emphasis on the stability of the children's placement with the Foys. Aguilar pointed out through cross-examination potential flaws with Achacoso's fact-gathering and analysis. Such weaknesses of

10

Achacoso's opinion, if any, go to the weight accorded it by the court as factfinder and adjudicator. The court did not abuse its discretion by admitting the opinion and evaluating its merit alongside other evidence.

**Termination**

Aguilar contends that the evidence is legally and factually insufficient to support the findings necessary to terminate his parental rights. Aguilar challenges the trial court's findings that he had done the following with respect to each of the two older children:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

Tex. Fam. Code Ann. § 161.001(1) (West Supp. 2011). He also challenges the trial court's finding that termination was in the best interest of the two older children. *See id.* § 161.001(2).

Standard of review

Review of the sufficiency of evidence in parental-rights termination cases differs from sufficiency reviews in most civil cases because the standard of proof is higher in termination cases. Termination of parental rights under the Family Code requires proof by clear and convincing evidence rather than a preponderance of the evidence. *See id.* § 161.001; *Wetzel v. Wetzel*, 715 S.W.2d 387, 389 (Tex. App.—Dallas 1986, no writ). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the

11

allegations sought to be established." *Id.* § 101.007 (West 2008); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

The supreme court recited the standard of review for legal and factual sufficiency challenges in *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (citing *J.F.C.*, 96 S.W.3d at 266). When the legal sufficiency of the evidence is challenged:

> [A] court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.

*Id.* at 344-45 (citing *J.F.C.*, 96 S.W.3d at 266). The supreme court noted that appellate courts review disputed or conflicting evidence only when the factual sufficiency of the evidence is challenged:

> "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." [*J.F.C.*, 96 S.W.3d at 266]. The court of appeals should further explain in its opinion "why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding." *Id.* at 267.

*J.O.A.*, 283 S.W.3d at 345. When conducting a factual sufficiency review, we review all of the evidence in a neutral light. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

Acts or omissions justifying termination

Legally and factually sufficient evidence supports the finding that Aguilar knowingly placed the children with a person who endangered the children's physical or emotional well-being or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being. "Endanger" means to expose to loss or injury, or to jeopardize the child's emotional or physical health; it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *See Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Aguilar left the older children in Meissner's care when he went to work and to prison. Despite the absence of evidence that she directly harmed the children, Meissner's testimony regarding her daily, weekly, and monthly consumption of alcohol and illegal drugs shows that her caregiver status placed the children in danger on a daily basis. She testified that Aguilar knew of her drug use and, therefore, the danger it presented to the children. While she typically did not take the children with her on her drug forays, the week-long trip on which she took one of the children with her illustrates that the children were in danger in her care. Aguilar confronted Meissner when she returned with the child after the trip, and there was evidence that a physical altercation occurred in front of at least one child. But there is no evidence that Aguilar removed the children from her care thereafter or ensured that she would not be under the influence of drugs while responsible for the children's care and safety.

13

Although Aguilar disputed some of Meissner's testimony, the standards of review requiring sufficient deference to the factfinder favor affirmance. Although the trial court did not specify any particular endangering conduct, conditions, or surroundings near which Aguilar left the children, Meissner's drug use could support the findings—particularly in light of Aguilar's repeated arrests, some of which left the children in Meissner's care. Under both the legal and factual sufficiency standards of review, we must conclude that the record contains sufficient evidence to support a choice to credit Meissner's testimony over Aguilar's testimony regarding his knowledge of or role in her drug use that endangered the children. Meissner testified to extensive use of alcohol and illegal drugs, Aguilar knew of at least one instance in which Meissner took a child along with her during a week-long drug trip, and yet Aguilar allowed his children to stay with Meissner. We conclude that legally and factually sufficient evidence supports the conclusion that Aguilar knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, and knowingly placed the children with a person who engaged in conduct that endangered their physical or emotional well-being.

Children's best interest

Next we examine whether there is legally and factually sufficient evidence that termination is in the children's best interest. Factors commonly used in making best-interest findings include: (1) the child's desires; (2) the emotional and physical needs of the child now and in the future; (3) any emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by those individuals or by the

14

agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976); *Leal v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 315, 321 (Tex. App.—Austin 2000, no pet.). The factors listed in *Holley* are not exhaustive, and other appropriate factors may be considered. *Holley*, 544 S.W.2d at 372. No one factor is controlling, and the facts of a case may mean that evidence of one factor is sufficient to support a finding that termination is in a child's best interests. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.). The absence of some factors does not prevent the jury from finding by clear and convincing evidence that termination is in a child's best interest. *In re C.H.*, 89 S.W.3d at 27. The best-interest standard does not permit termination merely because a child might be better off living elsewhere. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). The strong presumption that a child's best interest is served by keeping the child with his or her biological parents disappears when confronted with evidence to the contrary. *In re A.I.G.*, 135 S.W.3d 687, 692 (Tex. App.—San Antonio 2003, no pet.).

Viewed in the light most favorable to the verdict, the evidence is legally sufficient to support termination. Aguilar was incarcerated when the Department intervened and had left his children in the custody of someone he knew was regularly using illegal drugs. When the children were removed, they had psychological issues such as separation anxiety and aggression. Those issues have resolved or at least eased with therapy, time away from the unsettled conditions of their early years, and time in the Foys' more structured environment. Meissner testified that she feared

15

the possibility that Aguilar would be violent in the future around the children. Based on Meissner's testimony, he hurt her "several times" and at least once kicked her in one of their children's presence, which raises the possibility of emotional harm to the children from witnessing such violence. Aguilar had a fairly extensive criminal past and a history of incarceration that his more recent stability does not remove from consideration. He is still on probation, which introduces a risk of instability not present with the Foys. His failure to pay child support or make any effort to establish or enforce a right to contact the children through legal channels during the three-year course of this lawsuit is cause for concern.[3] Before the judgment, the children had lived with the Foys for more than four years—more than three without visitation or monetary support from Aguilar. Evidence of the Foys' care for the children, the children's bond with the Foys, and the children's improvement in the Foys' care supported the argument by the children's attorney ad litem for termination. This evidence allowed a reasonable trier of fact to form a firm belief or conviction that termination was in the children's best interest.

When the evidence is considered neutrally on factual sufficiency review, we must take into account the undisputed evidence of Aguilar's parental abilities and reported reformation. Courts have held that, in a termination suit, "acts done in the distant past, without showing a present or future danger to a child, cannot be sufficient to terminate parental rights." *Wetzel*, 715 S.W.2d at 391 (citing *Hendricks v. Curry*, 401 S.W.2d 796, 800 (Tex. 1966)). Courts have also held,

---

[3] Other than the temporary restraining order that expired in June 2007, we are not cited to any orders restricting Aguilar's right to interact with the children or any petitions or motions to establish visitation filed by Aguilar in either the Bosque County or the Williamson County proceedings.

16

however, that in considering the best interest of the child, factfinders are not required to ignore a long history of dependence and abusive behavior that abates as trial approaches. *See In re M.G.D.*, 108 S.W.3d 508, 513-14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (cited in *Smith v. Texas Dept. of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.)). The *M.G.D.* court held that "evidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue." *Id.*

The only evidence in the record regarding Aguilar's current parenting abilities is his and Meissner's testimony that he is a good father who has stayed clear of crime, illegal drugs, and alcohol since July 2006. Meissner testified that, when she was with him, Aguilar was a good father "when he wasn't drunk"—and even then he would only get drunk when others were watching the children. Aguilar testified in 2010 that he had stayed in good standing on probation for almost four years, kept the same job for four years, and lived in the same house for three years. He testified that he is married with a new child and two step-children and that he completed all classes the Department assigned to him when the children were first removed. He and Meissner testified that he visits the younger child as scheduled. Aguilar testified that he is current on child support. The only testimony as to his interaction with the younger child is that it is appropriate. Despite their past conflict, Meissner described Aguilar as a good father who loves his kids. The evidence of Aguilar's behavior is unrebutted by any evidence from the Foys or their experts who did not interview or investigate him.

The evidence of Aguilar's apparent reformation, however, does not erase the evidence of his criminal past or his assault on Meissner. Though Aguilar denied hitting Meissner,

17

the trial court could reasonably choose to credit her testimony that he hurt her on several occasions—at least once in front of one of their children. The court could reasonably credit Meissner's expressed concern that he could have another violent outburst, placing the children in danger of emotional injury at the least.

Even if the factfinder credited the testimony about Aguilar's parenting abilities, that evidence was not dispositive of the children's best interest. Their treating psychologist testified that his assessment of the children's best interest was based primarily on providing them a stable environment. Aguilar was incarcerated when Meissner designated the Foys to care for the children. Aguilar saw the children three times in the next ten months, and did not see them again for three-plus years while this case was pending in the trial court. During that time, Aguilar did not attempt to see the children and did not pay child support for them. The record is devoid of motions or other attempts to assert a right to visitation. There is no record of phone calls, letters, or emails to the children from Aguilar. The only reported attempt to remain in contact with these children is Aguilar's sending of presents at Christmas and for some, but not all, three birthdays that passed for each child during the time Aguilar was absent. Meanwhile, the children bonded with the Foys and now consider the Foys to be their parents. At the time the judgment was signed, each child had lived with the Foys for more than half his life (and that percentage has only grown during this appeal). In contrast to their early years of instability with Aguilar and Meissner that the children's psychologist testified caused attachment issues and agitation, the children's years with the Foys have been a good mix of structure and nurture according to the evidence from the home-study counselor and their treating psychologist. The undisputed evidence is that the Foys created a very

comfortable, loving, respectful, wonderful place for the children. That environment combined with therapy had helped the children resolve some, but not all, of their psychological issues.

While no clear explanation for the duration of this case is apparent in the record, there is no indication that anyone prolonged the case to gain an advantage. The evidence in the record shows, however, that the duration of the case has allowed the Foys to demonstrate that the children are doing well emotionally and physically in their care. During that time, the relationship between the children and Aguilar has attenuated to such a degree that they consider the Foys to be their parents. The children's psychologist emphasized the importance of stability, and termination of Aguilar's parental rights facilitates stability of the placement that has allowed the children to overcome the instability of their early years with Aguilar and Meissner.

Based on the record presented, the evidence is legally and factually sufficient to permit the trial court to reasonably form a firm belief or conviction that termination of Aguilar's parental rights is in the children's best interest.

## CONCLUSION

Finding no error presented in the trial court's admission of evidence or its findings supporting the judgment, we affirm the judgment terminating Aguilar's parental rights.

_____

Jeff Rose, Justice

Before Justices Puryear, Rose and Goodwin

Affirmed

Filed: March 1, 2012

19